I represent Ms. Jim. Oh, so you must be Mr. Nino? I am, Your Honor. Okay, you're going to split your time. Yes, we've already discussed it. You've got a clock in front of you. Okay. Whatever you leave on the clock. Thank you, Your Honor. I do represent Ms. Jim in case number 11-30102. And may it please the Court and Counsel, on March 11th, we have one issue that's unique to Ms. Jim and Mr. Sines has to do with it. That's four issues into which we've joined. On March 11th, 2009, culminating a one-year investigation by the U.S. Wildlife Service, a search warrant was obtained and the... We do know the facts. Why don't you get to your issue? Okay, Your Honor. Since time is limited. Is this a Miranda issue? Certainly it's a Miranda issue. That's what I'm talking about. Ms. Jim was rousted out of bed. Why isn't that waived? Why is it not waived? I addressed that... To get to the meat and coconuts, right? In my reply, I addressed... Was it raised below? No. Not a violation of this magnitude was not waived below. It was not discussed below. We don't have the benefit of a prior ruling. There was no motion to suppress. There was not. There was no hearing on voluntariness. In fact, this wasn't brought to the District Judge's attention at all. Exactly. And our whole argument... Basis of our argument is all the evidence comes in through the government that we are using to present what we think is plain air before this Court. But Murillo blocks that, doesn't it? Hasn't that issue been decided previously? No, Your Honor. There are plenty of cases that under circumstances where there's plain, clear, and obvious air that affects substantial rights. And I relied on Craighead, and Craighead has very similar facts. And the Craighead was a de novo review because it was brought up before the Court, but in this case it was not. But we assert there was error because look what happened. They sat her down for three and a half hours and grilled her. She spilled her guts, and on the night of my brief... They told her she was free to leave at any time, and she did get up and go eventually. They didn't stop her, didn't say anything. She just got up and left. At the same time, she was told when she answers questions, they better be truthful or she faces a felony, she'll go to jail, and she won't be able to help her family. Was that a false statement? If you look at the context, we're talking about a police-dominated atmosphere here, and if you look at the context of the entire situation where she was barred from answering her phone, she had to ask for diabetes meds, she had to ask for food, she had to ask to get dressed, the context of the situation over three and a half hours... All we have is what the government puts in. Maybe they have a lot more to show voluntariness. I mean, if you raise the issue, you can have an adventure hearing, you can put in your evidence, and they can put in their evidence. We don't know what really happened. That's why we have these things considered by the district court first, and we have an adventure hearing, we have findings by the district judge. We have none of that here. Certainly, the case law gives you discretion to, and it's permissive, to look at this situation and agree or not with our... But let's say we were sympathetic to that and we were inclined to do it. How do we know we have all the facts? I mean, for all I know, in the middle of all of this, she went down to the 7-Eleven to pick up milk. You know, she had to go down to the store. We don't know that that's not true, right? We know that she was grilled for three and a half hours. I know, but in the middle of this, she could have left, visited the neighbors, come back. She could have left. I mean, is there anything about what we have that's inconsistent with that? The trial where the agent who interrogated her was... But this wasn't the issue. The issue of voluntariness was not presented. This was presented. Well, again, Craig had analyzed the situation where you're in your own home. What's it mean to be interrogated without Miranda and then giving incriminating statements? What does that mean in your own home? And it means whether or not there's a police-dominated atmosphere, and I've got the four factors in my brief to analyze that. And we feel certainly there was a police-dominated atmosphere here, and quite frankly when this emerged after I started reviewing the transcripts, I have no clue why or what reason that it was bypassed and not erased. But then that gets back to what the Chief mentioned before. Craig had, and a lot of others, I've personally sat on at least three panels that deal with this home interrogation and the Craig had factors. But those all involve situations where a motion to suppress was made to the trial court. Here you're claiming that we should look at the Craig had factors in a situation where it was not raised below. At best you have plain error review. And as the Chief mentioned, because there was no cross-examination about this issue, we don't really know the facts. I mean, we're a court of appeal. We don't have a divination program here. We have no idea what happened except what's in the record, and we don't know what actually occurred without cross-examination. And we're conceding to the government's testimony, agent's testimony and evidence. You have pretty good ineffective assistance of counsel claim, but it's not yet right. Ms. Jim may have that, number one. Again, that was not litigated. No, and it's not right. Exactly, and that's why it's not included here. No, no, I understand. I mean, she will still have that regardless. Okay. Thank you. Thank you. We'll hear from Mr. Saenz. Robert Saenz. Thank you, Your Honor. I'm here today representing Rick Wachumwa, and Mr. Wachumwa is also in the courtroom with us today. He's taken off today from fishing on the Columbia River to come to court. We've raised four separate issues. The first is whether the government needs to have a search warrant before they can go into a person's home with a video camera and video camera what's inside the home. Don't we need to start, counsel, with the concept, though, that here by, I gather, everybody's concession, the agent was invited into the home. This is not a situation like in Kylo where you have an intrusive device that's going into the interior of the home from the outside without consent. Here you have the agent that your client relied upon, I guess, and he came in. He saw certain things. He had this device on that both recorded and videoed what he saw. So we need to distinguish right off the bat this concept of, you know, what is an unlawful search and seizure. We have a very fine area that we're dealing with, do we not? Yes, we do, sir. First of all, the government and the concept, the consent, all you need is consent to do that, is from the United States v. White case from 1971. Since White, we've had Katz, which cast doubt on the holding in White permitting the warrantless videotape based on consent of an informer inside the home. Katz doesn't deal with consent. I mean, you've got the whole line of cases, HAFA. I mean, you've got a whole series of third-party consent cases. Correct, Your Honor. Katz has nothing to do with that. Katz was non-consensual. True. They put the microphone and the tape recorder on the outside of the phone booth. That's correct. But the court in White declined to follow Katz because they thought that Katz was not retroactive, so they didn't analyze whether or not there was a reasonable expectation of privacy that would be violated by the secret videotaping. But after Katz, we've got, well, NERBR, this case in court in NERBR. Yeah, but NERBR, with respect, counsel, NERBR involved the installation of a hidden video camera. That's quite different, is it not, than somebody having the equivalent of an iPhone and just scanning what that person observes. That's correct, Your Honor. So NERBR, do you agree that NERBR is distinguishable? It's distinguishable because the camera was installed, but the footnote in NERBR indicates that it doubts that a video camera inside of or the consent issue of the interaction between the informers and the defendants would be dispositive inside a home. But I think that we're moving on to the Jones case where we've returned. We have two tests. We have reasonable expectation of privacy, and we have a trespass. You're talking about the Supreme Court's case last term, right, the Jones case with the GPS device. Correct, last January. And now we have a different test involving a search inside one of the protected areas, you know, person, houses, papers, and effects. And I would submit, Your Honor, that the entry of the agent based on misrepresentations as to what he's going to do there amounts to a trespass. Why doesn't HAFA just cover that? I mean, essentially what HAFA said in plain English is, look, when you invite people into your circle of friends, then you take the risk of misbehaving. And misbehave, I mean, you've got to sort of read it in the context of that time and that, you know, the technology of that era, and what they basically said is if you say secrets in front of them, you take the risk that they're going to go out and tell you secrets of the world, including the prosecutor or tell them in court. Why doesn't the same rationale apply to today and say, look, you invite somebody into your home, you know people now have these electronic devices that they can carry for all I know you have a recorder in your pocket and you're recording this entire proceeding. I'm not saying you are. I'm just saying for all I know it could be true. I would expect counsel wouldn't bother doing it since we're recording everything anyway. I'm sure you are not. No, I'm just giving an example. I don't know. I couldn't, other than the fact that you're a lawyer in this court, that you wouldn't do that. Anyone in the audience there might have a camera, might have a recorder, and that is certainly true in daily life. If you're having a conversation with somebody or now we have, don't police now have recorders and sometimes cameras on them to keep, you know, they have these disputes as to, you stop somebody on the road and then say, oh, the police struck me first or something and they say, oh, here's a movie of you doing it. Why isn't that one of the risks of modern life is that if you let somebody into your home that they might carry with them an electronic recording device or one of the other gadgets that are now so readily available? I think there's a real important difference between the government doing it and your gossipy friends who likes to listen to you and then tell your secrets. But Hafez says there isn't a difference. Hafez says whatever your friends can do to you when you let people into your circle of confidence, if they can betray you, then the fact that the person turns out not to be your friend, turns out to be a police agent or something like that, he can do whatever one of your faithless friends would do. Why couldn't one of your faithless friends have a recording device? Right. It's not limited just to the recording devices, the pinhole camera. None of our friends are going to have a pinhole camera. I'm sorry? None of our friends will have a buttonhole camera. Why is that, counsel? I know you made the point that this was a rare device. You can go into, I don't know, Seattle all that well,  but it's readily available. It's no different than an iPhone. iPhones and things like it, they're smaller and smaller and smaller. It's really very easy to find them. Or pens. Yeah, pens. Things that look like pens but actually have a camera and a battery and a recording device. It's unsettling, I'll tell you. It makes life... You can also buy a device that will track cell phones, will mimic a cell phone tower, and so that you can actually gain access into somebody's phone, either locate where they are or to actually listen to the conversation. You could buy those devices. I use it every day. Isn't the distinction with the Supreme Court doing Kylo, and then said, look, if it's the kind of thing that is in common use, then the police can use it. I guess in Kylo they had this thing that read the temperature of the house. They said that's not in common use, and that's where they drew the line. So many cameras, I think, are in common use. As Judge Smith suggests, you can buy one of those anywhere. Mr. Sines, you made a statement a while ago that based upon the agent's gaining entry by misrepresentation, that amounted to a trespass, and therefore the consent was, you know, he went beyond the consent, or consent was fraudulently obtained. Do you have any cases that support that theory? Yes, Your Honor, except there was a case I located just last week, and there are more. It cites the second restatement of torts, and it's the Theofil versus Farrelly case, and it was a case where- What's the citation? You got a citation? Yes, I do. It's one of Judge Kuczynski's opinions. It's Theofil versus Farrelly-Jones, 359 Fed 3rd, 1066, 9th Circuit, 2004. In that case, the court cited to the second restatement where it's specifically in the illustrations that an officer going into the home with a video camera under false pretenses commits a trespass. Well, what's the false pretense here? Did he say anything about- Did he deny having a little lapel camera or something like that, or did he make some false representation? No. He went into the home without disclosing the fact that he was going to record the entire conversation and the entire interior of the home. So you think that's sufficient to what? Yes. I guess, failure to disclose? Does he have some duty to disclose? According to the restatement, yes, and there's different distinctions. In fact, like the restaurant critic does not have a duty to disclose their restaurant clinic, but it's a significant difference for a law enforcement officer using the power of the government to enter a home under those same false pretenses. Can I go back for just a moment to the earlier issue? It seems to me that you are foreclosed under HOFA with respect to the audio portion of this, are you not? Yes, under the Wiretap Act, one-party consent is sufficient. I would suggest, however, under Jones, even that's in question. So you're basically hanging everything on Jones and you're focusing exclusively, not to make a pun, but you're focusing on the video, is that right? Yes, sir. In that under-established precedent, I think clearly, and it's the narrowest possible grounds that you could rule that the video requires the warrant. One other question. Since the agent saw everything he videoed and his testimony individually could corroborate that when combined with the audio, do we even have to get to this issue? We're not supposed to reach constitutional issues that are unnecessary. In this case, can we treat that as harmless error, that is the bringing in of the video portion of this? Yes, I'd respectively say no because the camera, as it's been repeatedly stated, is the unblinking eye that you can replay over and over again. You can look on the bookshelves, see what kind of books a person is reading. And I would go back to the analysis of Justice Harland and his dissent in Dwight. We should look at this from the point of view of the innocent citizen, that law enforcement could go into anybody's house with a camera and photograph the entire inside of the house, along there with the occupant, and then no one would ever know about it. So I think we should take a look at the dissent in Justice Harland, the dangers of allowing the government a license to, by subterfuge or however, whatever means of technology they have, either electronically or with a video camera, record conversations or the contents inside a house. In fact, where else can we go in this day and age with this technology except inside our house to try to avoid government? And under the original intent of the framers of the Constitution, they enumerated that the house, along with your purse and the fax and papers, are specifically protected areas, entitled Special and Extra Protection. And yet in our houses, sometimes by consent, sometimes by not, we have gazillions of cookies in our computers, and everything else we have that lets private companies know, and the government inquires of them where we go, what we eat, what we buy, where we're going, what we think in some cases. It's a tough area. I grant you that, but I'm struggling with why the video itself, where the agent saw what he did, why that overcomes this hurdle for you. But I appreciate your argument, counsel, and know it's a sincere and important one. Thank you, Your Honor. Thank you. We'll hear from the government. Good morning. My name is Tim Holmes. I'm here from the U.S. Attorney's Office for the Eastern District of Washington representing the government. First, just to touch briefly on the Miranda issue with regard to Ms. Jim, I would ask this court to enforce Federal Criminal Procedure 12B3C, which is the rule that requires motions to suppress to be brought free trial for the reasons that were raised during the argument. And I would challenge some of counsel's. What would a motion to suppress bring us other than the view of the district judge? What difference would it make? Well, one thing is this contact between Agent Dean and Defendant Jim over a period of three and a half hours was all recorded, was all put on an audio recording. That audio recording is not in evidence. That audio recording has the statements of Agent Dean to the defendant and the defendant's responses, including responses concerning her willingness to answer questions. Also, the counsel's statements or characterization of the interview that the defendant was grilled for three and a half hours, I listened to that recording again over the weekend. I would just challenge that and indicate that that's not an accurate characterization of what occurred on the recording. So the Craighead factors are all... What's the issue? The issue is voluntariness. Is that right? I mean, the issue on the merits is voluntariness. Is that right? As I understand it, the issue is custody. That's the principal issue, whether or not, in fact... All right. So that's one of the issues that the defendant has to overcome before you even get to whether or not Miranda applies, right? Yes, Your Honor. All right. And district court made no determination of custody or did it? It did not because the issue was not raised. Because it was not raised. All right. Is it clear from the record one way or another whether Jim was in custody? Well, I would argue that the facts support the conclusion that she was not in custody. But it is a fact-based inquiry that depends upon specific analysis of the Craighead factors. And there are factors that support an argument for custody because there were a number of agents there, as there are typically, with the service of a search warrant of this nature. And if the court would like me to go through the Craighead analysis, I will. But it's fact-specific. And in this case, she was not isolated. She was in the living room of the house. Her son was present. She was allowed to delay the interview until her son went to school. She was able to see... But I gather that at the bottom you're saying that because they didn't move to suppress all the evidence that would counter bail, their position was not brought into evidence and we're not really in a position to fairly evaluate what happened without that. That's correct. And I think if a 2255 motion were brought, the entire recording would be placed into evidence. The district court judge would have an opportunity to evaluate that and evaluate the defendant's demeanor. So if we were to side with the defendant on this, the best we could do would be to remand for a hearing before the district court. Yes. I wonder if we could get for a second to the multiplicitous nature of counts 2 and 3 and counts 4 and 5 with respect to both Mr. Wachuma and Ms. Jim. I'm having real difficulty to seeing why those counts are not multiplicitous. They seem part and parcel of the same thing, and based upon the case law, particularly the Blockberger test, it seems to me that the government's kind of doubled up on these. Tell me why I'm wrong. Well, because Congress made it a separate offense to offer to sell eagle feathers and to sell eagle feathers, and an offer to sell eagle feathers is not inherent in a sale of eagle feathers because an individual could walk up to someone with eagle feathers and say, I'll give you $1,000 for that eagle tail set. There's no offer on the part of the person who's making the sale. But under the Blockberger, I'm sorry, go ahead. But I don't think that quite gets you there. All that says is that you could have a sale independent of an offer, so you could have an offense even without an offer. But when you have a single transaction that involves an offer and a sale, when you stack them up that way, why don't they become multiplicitous? Well, in this case, in both instances, you had an offer of multiple feathers and then a sale of a specific feather or a specific set of feathers. With regard to, I think it's counts two and three, there was an offer made via text messaging and photographs that were sent over the cell phones. I think the Blockberger test is usually phrased in terms of whether or not one count has some element, right, has an element of the crime that's different or in addition to the elements of the other offense. Correct. Now, which one of these has an extra element that the other doesn't? Well, an offer to sell eagle feathers does not require a sale of eagle feathers. A sale of eagle feathers does not require as an element an offer to sell eagle feathers. And in a case like this where you have somebody who is offering multiple feathers, that's a separate offense. Well, but when you say, well, in the sense that, for instance, you could charge a single individual with multiple sales, right, sale of one feather, sale of feather number two and so forth? Yes. It's the same as that, like a series of sales? In other words, the offer covers, well, what are you saying, a different sale than the sale itself? I think the offer covers, and if you look at the instance of the eagle plume, the way that was characterized by the witness was that it was essentially a sales catalog. So offering that sales catalog is an offense, and it's different in nature than just simply selling one plume. But you don't have a situation here, do you, where Mr. Wachum was accused of making two separate offers, only one of which resulted in a sale? No. That's correct, Your Honor. So under Blockberger, doesn't that create a problem for you? Because that requires that both statutory provisions contain an element that the other one does not. Well, I think that is the case here. So you rely on the offer and sale distinction. Is that the best argument that the government can make for why this is not multiplicitous? Well, that's the argument with regard to the elements. They do have different elements, and that's what they are. And then there's this other issue that's out there with regard to sort of the practical concern. How far can you break down a single transaction?  Somebody walks into a bank, pulls a gun, says, give me your money. And they hand, because she hands over the money, could you charge those two crimes or one crime of sort of asking for the money and then a separate crime of actually taking the money? I don't believe that there's this. Well, there's sort of separate elements. I mean, can Congress, let's say, or the state legislature, whatever, defines it as a crime. The crime is to sort of ask for money in a bank, and then a separate crime is actually taking the money. So, well, you know, you could pull a gun, ask for money, and they say no. And then you leave, and, of course, you've committed a crime. I mean, it's still a robbery whether you get the money or not, right? Could you then sort of say, well, we're going to have separate crimes for asking for the money and then receiving the money? Well, I'm not aware of any crime that's defined that way. Well, couldn't it be? I mean, that's essentially what's happening here. You're saying you've got the offer, and then when the offer results in a sale, you've got a separate crime for actually making the sale. Yes. And you conceded that there was no separate offer made that did not result in a sale, and therefore you get to where the Chief's talking about. You see, as I said, what these questions are getting to, it's almost this offer and the completed sale is, you know, almost the same as, like, you know, an attempt and a completed sale. You could say a person in the Chief Judge's example who goes up to the teller and says, you know, give me your money is attempting to rob, right? And then if you get the money, it's a completed robbery. That's the same thing with an offer and a sale, isn't it? I don't believe it is. You think you could? Well, first of all, you agree you can't charge a person with both an attempt and a completion of the same crime. Yes, Your Honor. Oh, it's just different. I would argue that this would be more analogous to a person who had, you know, over 50 grams of actual methamphetamine and then was charged with possession with intent to distribute and then took a portion of that methamphetamine and sold it to an undercover officer and was charged with the sale of that. But that's different. Is it not in possession with intent to sell? And if, in your example, he offered to sell the methamphetamine and then somebody bought the methamphetamine, that's really the analogy we're dealing with here, isn't it? Yes, although Congress didn't make it a separate offense. I understand that. And that's our problem here, I think, is that we're struggling with the fact that it seems like counts two and three seem to be pretty much the same thing and four and five seem to be pretty much the same thing under the Blockberger test. That's what we're struggling with here, not the analogy that you gave a minute ago of possession of methamphetamine with an intent to sell. That's a very different analogy, I think. Well, I do think that there is some assistance provided from the Tenth Circuit in their IUPA versus United States case from 1968, which found there was no multiplicity when count one charged unlawful possession of migratory birds and count two charged unlawful transport of the same birds. But that doesn't help much. You can have possession without transport, but you can't have transport without possession, can you? No, you can't. In this instance, in this case, you can have a sale without an offer and you can have an offer without a sale. And I think that's all I can really offer this Court in terms of how to distinguish these, other than to say that as a practical matter, when you're dealing with someone who possesses a catalog of feathers and offers it to someone, my view is that the congressional intent is that that's an offense and should be charged, and that offense is not fully captured if all you charge is just the sale of one of the plumes. Okay. Would the Court like me to address the issue of the video recording? Please. Sure. From my perspective and analysis, I think that the defense, the failure of the defense is in its recognition of or application of reasonable expectation of privacy, stemming from the Katz case, which is to say that, yes, a person does have a reasonable expectation of privacy in their home, but that reasonable expectation can be diminished when they invite, in this instance, essentially someone who was alike a stranger, they'd only had contact with them once before, into their home. Mr. Sines suggested that the Jones case from the Supreme Court's last term should inform our understanding of Katz. Is he correct about that? No. Why? Because the Supreme Court decision in Jones relied upon a trespass analysis, a trespass on the personal effects. Scalia's opinion certainly did. But Justice Alito's, I guess it was a concurrence, went off on the privacy analysis. Now, admittedly, the concurrence is not necessarily controlling, but I think he was part of the majority, in effect. So he does talk about modern devices, does he not, and reasonable expectations of privacy. Why isn't Mr. Sine at least partially correct that we need to consider reasonable expectation here? Well, I would argue that you do need to consider reasonable expectation of privacy. But under the Katz concept, right, and Hoffa? I don't think that Jones, any decision in Jones backs off of that. I mean, if you look at the circuit court's decision that gave rise to Jones, they analyzed it in terms of reasonable expectation of privacy, and they analyzed it in terms of no one could anticipate that somebody would follow every movement for a period of 20 days. And here, because the government agent was invited into the home and shown these things, that undermines his argument, too, doesn't it? It does. And the government's position is consistent with positions taken by the Second and Fifth Circuit with regard to videotape that occurred, the undercover videotape that occurred inside a residence, and the Third Circuit with regard to an undercover video recording that occurred in a hotel room rented by the defendant. Now, one of the things you said just a minute ago was that one of the rationales in Jones was that, well, a person, you know, wouldn't expect that their movements would be tracked, you know, for a 24-hour period or something like that. Now, isn't it equally true that a person would expect that somebody invited into your home would, you know, videotape everything in your house? I think that that's true. You wouldn't expect that because it would be an antisocial type of behavior. So doesn't that figure into the analysis under Jones? I think it's equally true that you wouldn't expect somebody to come in your home and do an audio recording of you. I mean, in terms of how we relate to our neighbors, that's fairly antisocial. But it doesn't create a constitutional violation under Katz and White, and going all the way back to Bellamy. What about under Jones? You just said under Jones. Well, I was referring to the circuit's decision in United States v. Maynard, and in that decision they say, unlike one's movements during a single journey, which is what the Knott's case was, the precedent that the government was relying upon, the whole of one's movements over the course of a month is not actually exposed to the public because the likelihood anyone will observe all those movements is effectively nil. Second, the whole of one's movements is not exposed constructively, even though each individual movement is exposed, because the whole reveals more than the sum of the parts. I think that that's a true statement, but I don't think that we can say that inviting someone into our home when you're engaging in unlawful conduct, that you can say that I would not expect, if they're law enforcement or working with law enforcement, that they're going to take the opportunity to try to record the unlawful conduct so that they have a way to present that to a trier of fact, to corroborate their own statements, et cetera. And I would also argue, I'm sorry? So the argument you're making is that your expectation of privacy is shaped by the nature of the invite of what you've invited the person to your home for. So let's change the facts here just a little bit. I don't want to put words in your mouth. I just want to understand. But let's say this had not been an undercover agent, but this had been a neighbor who maybe was working with authorities, and a neighbor was invited into the house for a barbecue or a meal. And while there, because they were working undercover with authorities, they carried a camera and they made a point of going through the house and photographing that disclosed eagle feathers or other contraband. Your argument would be that would be a different expectation of privacy because that's a neighbor? No. My argument would be that would be a trespass because they're going to parts of the home that they were not in. Let's say they go to the bathroom. They go to the bathroom and along the way they point the camera to down the corridor or they pass by an open bedroom and they're able to see in. So this was a commercial transaction here. So I thought what you were saying is that the expectation of privacy in a commercial, when you invite somebody in your home for a commercial transaction, particularly a legal commercial transaction, is different than if you invite somebody in your home who's a friend or neighbor. I think what I was doing was making a superficial distinction between what may be socially acceptable and what violates the Constitution. I was, you were making that distinction. I was wondering whether you thought that was a constitutionally significant distinction. I think it's not because what we have to focus on is whether there's a constitutional violation, not whether there's a social violation that would anger your neighbor. The fact is that the constitutional principle is you don't have a reasonable expectation of privacy to those things that you voluntarily disclose or disclose to someone else. But you may disclose, if you invite neighbors into your house, you may expect them to be there, look around, perhaps in a pinch, testify against just what they see, but you sure as heck don't expect them to come in with a hidden camera and photograph everything in your house. You might have that suspicion if you invite somebody in to buy illegal drugs because you might say, well, if you're, or illegal, any kind of contraband, you say, well, you're inviting them in, they could be an agent, and so you take that risk that they might have a camera. But if you're just dealing with social friends, you know, your neighbor's friends like that, nobody expects, nobody expects a neighbor or a friend to come in and all the while have a hidden camera recording everything that's going on. I think most people would feel violated if they learned that that friend or neighbor had done that. I can't disagree with you in terms of the social context, but the constitutional analysis is if you voluntarily expose that to another person, that person can testify about it in court, and if that person can, and if it's something that they can hear, they can record it. If it's something they can see, the constitutional analysis is that it's not a violation of the Constitution to record that and to be able to provide that to a trier of fact. And HAFA really answers that question, does it not? I believe it does, and I believe that it's... because if you let people in, they might testify against you. And that's true whether they're a social friend or a business friend or anything else. If you let them know how, you know, they are there and they see things, they get put on the subpoena and they have to testify, you know, you take the risk that whatever they see, they can talk about. But it's really quite different to say that you take the risk that they're going to have a permanent recording of everything that happened there, a permanent video or audio recording. That I'm not sure HAFA talks to. Well, but under CATS, it's a question of reasonable expectation of privacy, and you don't have a reasonable expectation of privacy. This is the principle. You don't have that if you voluntarily disclose that to... But that's the very question we're considering. What does an expectation of privacy consist of? You might say, look, you let your neighbors in, you know, you can't expect that they won't talk about if called to court and put under oath that they will lie or refuse to testify as to what they see. That is a shared expectation. Do you have an expectation that they will come in and actually photograph and record everything that happens while they are there? I don't think that you have that. As I indicated, I think there's a distinction between what we expect in a social context and what may violate the Constitution. A person does not... The Constitutional principle has been applied over and over. But the Constitutional principle is reasonable expectation of privacy. That's what CATS tells us. And if you don't have a reasonable expectation that friends or neighbors will come in and record everything, why doesn't that become a violation of the Constitutional norm? Whether they record it or not is not the issue. If they can see it... But it is the issue. It's not under CATS because... I understand you don't think it's the issue, but indulge me and assume it is the issue. Assume that it really matters whether or not that's what you expect. Doesn't that become the Constitutional standard? It does not. At page 352 of CATS, the Court said, what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. It's not a subject of protection. So you're safe and private in your own home, but once you bring other people into your home... No, but you can't... You really can't take that statement in CATS literally these days. I mean, look at all the cases, you know, that say just to the contrary. For instance, like, you know, on these tracking cases, the fact that you're exposed to the public when you're on the streets 24 hours a day doesn't mean you can collectively, right, gather that stuff, you know. That's contrary to CATS, isn't it? I think what the Circuit Court said in Maynard is that that's really... There isn't an actual exposure of your entire course of travel over... But there is. There is. You're out on the street. Well, that's not what the Court said. The Court said, yes, there is when you go from point A to point B, but not over a period of 28 days. Why not? You're on the public every one of those days. I think that's what the government argued. That's the point. I mean, that's why you can't apply it literally. That's what the government argued. The Court, the Circuit Court in that instance, found that it was something different viewed collectively. I'm only asking the Court here to apply what I believe is the legal standard, the constitutional standard, which is the principle is that you don't have a reasonable expectation of privacy and things that you voluntarily expose. Can I ask you? I'm running way over time here. I'll ask you the same question I asked Mr. Saenz, and that is since this is a sticky constitutional issue and Mr. or the agent saw and described what he saw with his eyes, there's also the audio portion of it. Can we treat the video aspect of this as harmless error and not treat the constitutional issue and do what we're supposed to in this case? By that I mean analyze it appropriately. No, I think you can, and I've laid out some precedent for that in my brief. In this case, the defendant also made admissions, waived his Miranda rights and made admissions. On the other hand, we could say there was a constitutional violation, but say it's harmless. We could do that too, right? The Court can do that. I'm asking this Court to follow the precedents set out in the Second, Third, and Fifth Circuits. I think we got it. All right. Thank you, Your Honor. Thank you. I don't think you have much time left, defendant, but we'll give you a minute for a bottle if you really choose to take it. Can I have my minute, Your Honor? One minute. Your Honor, at the bottom of Ms. Jim's excerpts of Record 106 and the top of 107, the agent, Dean, is asked, the interview went on for three and a half hours, correct, during which you let her go put pants on at some time? And the agent answers, yes. Then mid-page, she's asked, Ricky was arrested sometime during that three and a half hours, and the agent answers, yes. With regard to the issue of whether Ms. Jim was under custodial interrogation, our brief lays out the Craighead criteria regarding police-dominated atmosphere, and we've also analyzed it in the brief, and I ask the Court to consider those. Thank you. Thank you. Okay, thank you. Cases are, you will stand submitted, or cases, I guess. Oh, same number, huh? Cases are, you'll stand. Two numbers. There are two cases, right? Two numbers. Cases will stand submitted. We're on to the next case, which is conservation, Northwood, Northwood, Northwood.
judges: Kozinski, Tashima, Smith